BURTON (DOREMUS v.). See Case No. 4,-002.

## Case No. 2,217.

### BURTON v. LE ROY.

[5 Sawy. 510.][1]

Circuit Court, D. California. May 22, 1879.

SEAL—SCROLL—VOLUNTARY AGREEMENT—NOT ENFORCED — RELATIONSHIP AS A CONSIDERATION—BILL TO DETERMINE ADVERSE CLAIM.

1. A scroll made with a pen, inclosing the letters "L. S." will be held to be a seal, if the party appending it to his signature to a written instrument intends at the time to adopt it as a seal.

[See note at end of case.]

2. It is not necessary to state in the deed, or in the witnessing clause, that the party has affixed his seal, in order to make a scroll a seal, if it is apparent from the instrument and the circumstances under which it was executed, that it was intended to adopt the scroll as a seal.

3. An executory agreement. or an imperfect conveyance, without a valid or meritorious consideration. will not be inforced in equity against the promissor or grantor, or his personal representatives, or subsequent voluntary grantees;

and a fortiori will not be inforced against subsequent grantees for a valuable consideration.

4. The relation of son-in-law does not constitute such a valuable or meritorious consideration as will take a conveyance out of the category of a voluntary conveyance within the rule.

5. Under section 738 of the Code of Civil Procedure of California, authorizing the bringing of a suit to determine an adverse claim to land, the complainant can only obtain relief upon the grounds alleged in his bill. If he alleges title in fee, and possession in himself, and an adverse claim as the only grounds for relief, and it appears in evidence that he has neither title nor possession, he can have no relief in equity.

6. Where a complainant asks to have determined an adverse claim to land, upon a bill alleging only title in fee and possession in the complainant. and an adverse claim by defendant. he cannot have a decree charging the defendant with holding the legal title in trust for him, and for a conveyance.

[In equity. Bill by L. E. Burton against Theodore Le Roy to determine an adverse claim to land. Bill dismissed.]

J. J. Williams, for complainant.
B. S. Brooks, for defendant.

SAWYER, Circuit Judge. This is a bill in equity, brought under section 738 of the Code of Civil Procedure, to determine an adverse claim to land. The land in question was granted by the Mexican government to Antonio Maria Olivera, and the grant having been confirmed, a patent issued on July 30, 1863. On April 24, 1853, the grantee, Olivera, executed, in favor of Joaquin Tico, an instrument which is presented here, and which was recorded October 14, of the same year. The only interest of the complainant in the land is such as is derived under this instrument. It is not clear from the terms of the instrument what it was intended to be. In fact, in what ought to be the granting part of the instrument, there are no terms of grant at all. It would seem that something had been omitted in that part of the document. Subsequently, the word "cesion" occurs; but it is not used as a granting term, but by way of recital, referring to some preceding word, with the view of declaring the purpose of the instrument, the "cesion" being declared to be for certain purposes mentioned. No consideration is recited in the instrument, and there is no seal; so that, putting upon it the most favorable construction possible, it is not a deed.

It is not claimed that it is a deed. but it is urged that, although void as a deed, it is good as a contract to convey. There is. however, no consideration whatever expressed, neither a valuable consideration, nor any good consideration. After the name of Joaquin Tico occur the following words, "my son-in-law"—thus, "Joaquin Tico, my son-in-law;" but it is apparent that these words are not intended to express a consideration, but are used as a mere description of the person—to designate the particular Joaquin Tico to whom the instrument was intended to be given. It is possible, certainly. that the instrument was made in consequence of his be-

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

ing a son-in-law of Olivera; but, if so, it is not so stated, and even should that be the case, it is simply a voluntary conveyance, and I know of no authorities which recognize the fact of being a son-in-law as constituting a good consideration. Whatever the instrument is, upon its face it is manifestly a voluntary instrument, possibly given because Tico was a son-in-law.

Subsequently, on September 29, 1855, Olivera conveyed to complainant, Burton, a portion of this rancho, described by certain boundaries, which include about two thirds of the grant, and in that conveyance no reference whatever is made to any prior conveyance to Tico. That conveyance does not embrace any portion of the premises in controversy, and the lands so conveyed are still owned by Burton. The instrument to Tico purports to convey one half of the rancho without stating whether or not it was an undivided one half, but such would, doubtless, be the construction; while to Burton, by deed of bargain and sale, is conveyed about two thirds of the grant, the westerly part embraced within certain specified boundaries, and the deed contains no exception of any interest previously conveyed to Tico, and no reference to any conveyance to him. On the contrary, the grantor, in the deed to Burton, declares that no lien or incumbrance has been created upon the tract.

On September 29, 1855, the same day on which the conveyance was made to Burton, Olivera and wife conveyed to Jose Olivera y Romero that portion of the rancho not previously conveyed to Burton, describing it as all the rancho not conveyed to Burton. In this conveyance, also, no reference is made to the document executed in favor of Tico, or to any conveyance to Tico; but there is a reference to the conveyance to Burton, the deed to Romero conveying all the rancho, except the portion previously conveyed to Burton; and in this second deed to Jose Olivera y Romero it is also set forth in express terms, that the grantors had neither sold nor conveyed the land described, and that they had put no lien or incumbrance upon it. In this deed to Romero is expressed a consideration of four hundred dollars, which the grantors declare they have received to their entire satisfaction.

The original deed to Romero is not produced, and what it contains I can only infer from the certified copy from the county records, which is presented in evidence. In that, there is a scroll written with pen and ink, within which the letters "L. S." are written. The deed is witnessed by two witnesses, and acknowledged before the county clerk, in the form required by law, by whom it was also recorded, as ex officio recorder.

Whether the original deed had a seal of wax or not we do not know, except so far as the fact can be inferred from the certified copy of the record in evidence; for there is no other evidence on the point. Recorders do not generally, if ever, attempt in their record to make a fac-simile of the seal. Generally, the record shows by a scroll, with the word "Seal," or letters "L. S.," written in it, that a seal was affixed to the instrument recorded, and a certified copy of the record can show no more. That is what this copy shows, and in this respect, this particular instrument is like most of the other numerous deeds introduced in evidence in this case by certified copies from the records, to which no objection has been made on either side, all of which have simply a scroll, with the word "Seal" written within it, the only difference being that in this instrument the "Seal" is not mentioned in the witnessing clause, while in the others it is; and in this "L. S." is written, while in the others it is "Seal." I am by no means certain, therefore, that I am not justified in presuming that there was, in fact, a seal of wax, or other lawful seal upon the original instrument.

It is claimed on the part of the defendant, that the instrument executed to Tico on April 24, 1853, is void, and conveys nothing; that it is not a deed, and does not pass the title. On the part of the complainant, it is admitted that it does not pass the title, but it is claimed that it is good as an agreement to convey.

As in the conveyance of Olivera and wife to Romero, no reference is made to a seal, either in the body of the deed or in the witnessing clause, it is insisted by complainant that the scroll with the letters "L. S." appended to the signatures of each of the grantors is not a seal, and that, therefore, his conveyance is in no better position than the instrument to Tico. On the other hand, assuming, for the purposes of the argument, that there was only a scroll, inclosing the letters "L. S.," and not a seal of wax to the original, it is claimed that no particular character of seal is required; that it is intended to be a seal, and that the parties could as well adopt a scroll as a seal as anything else. To establish the proposition that this device is not a seal unless it is referred to as such in the witnessing clause, or in some other portion of the deed, the complainant has cited several authorities. From an examination of the cases cited, and others, I think the authorities go to establish the rule, that if the device adopted is intended to be a seal, it is to be regarded as such, as is held in Relph v. Gist, 4 McCord, 271, cited by complainant.

The authorities are by no means in perfect accord upon this question. For instance in the case of Lee v. Adkins, Min. [Ala.] 187, cited on the part of complainant, the judges stood three to two for reversing the decision rendered by the chief justice, sitting in the court below, who held that the device adopted was a seal although no reference was made to it as a seal in the instrument; so that in fact, although three of the judges on

appeal rule that it was not a seal, yet, as the chief justice had decided in the court below that it was a seal, and as two of the judges upon appeal filed dissenting opinions, the court was actually equally divided upon the question, and that case can hardly be said to establish the rule as it is claimed by complainant to be. The chief justice expressed no opinion on the appeal, for the reason that he decided the case below. In other cases there are dissenting opinions. In the case of Long v. Ramsay, 1 Serg. & R. 72, where a scroll was used as a seal, without reference being made to it in the testation clause, or in the body of the deed, it was held to be a seal, as the court said it could determine from the face of the instrument that it was intended to be a seal. In the case of Taylor v. Glaser, 2 Serg. & R. 502, it is held that a scroll of that kind is a seal, if the evidence is such as to so inform the court that it can determine that it was intended for a seal. The chief point discussed in the cases seems to have been as to what evidence is necessary to determine that the scroll was intended to be a seal.

The great argument against the recognition of the scroll as a seal in instruments containing no reference to it as a seal, is, that it affords great facilities for fraud, as it may at any time be added to a signature to any instrument which was not sealed at the time it was made. But at common law, where wax was used as a seal, it was not necessary that it should be stated in the deed that the grantee thereunto appended his seal. That is laid down as the law, both in Comyn's and in Rolle's Abridgments. The simple fact that the wax has been affixed to the paper at the proper place is evidence that it is intended as a seal. But it is held at common law that the wax itself is not the seal, but the impression upon the wax; that the wax is only the medium for receiving the impression; and in modern times it is held that if the wax were removed, and the impression made upon the paper itself, the instrument would still bear a seal, as the impression, and not the wax, constitutes the seal. The seal was not required to be of any particular device, or of any peculiar name, but might be an impression of any kind, and any one kind of a device might be adopted by a person at one time, and another at another time. The argument that a scroll should not be accepted as a seal because it may be added to a paper at any time after execution, applies with, at least, equal force in the case of the wax seal, as it is certainly as easy to add the latter to an instrument as the former. Indeed, it would be less difficult to append, without detection, the seal of wax than it would be to append a scroll, because if added later, the latter would be likely to be made with ink and pen different from those used in writing the body of the instrument, or the signature to it, and in such case it would

appear that the letters "L. S." were in a different handwriting, or made with different ink from the body of the instrument or the signature.

If the scroll and letters "L. S." are adopted as a seal at the execution of the instrument, they would be likely to be made by either the party who drafted the instrument or the one who executed it, with the same pen and ink, and this would afford some security.

Then, again, it has been held during later years at common law, that a piece of paper attached in the form of a seal, and upon which there is no stamp or impression at all, is a seal; and the seals upon the very deed from Tico himself, under which the complainant now claims title, are of that description, being small square pieces of plain paper, bearing no impression whatever, attached with mucilage to the document. Such a seal is certainly quite as readily attached and much more easily counterfeited than a scroll containing two letters; and if such a piece of paper attached in that manner is a seal, certainly a scroll attached for the same purpose ought to be held to be a seal.

The great point of dispute in the cases really has been as to whether or not the device which appears upon the conveyance under consideration was intended to be a seal. This particular instrument is written in the Spanish language, the grantors being native Mexicans. The seal was not necessary under the Mexican law, and was made an essential part of such an instrument in California for the first time, upon the adoption of the common law and the acts concerning conveyances, in 1850. These parties, therefore, in all probability, were not accustomed to executing instruments with a seal, and were not acquainted with the formula: "In testimony whereof we have hereunto set our hands and affixed our seals." etc., because the Spanish form was simply: "In testimony whereof we sign our names, or execute, or make firm," as the word "firmo" signifies. As, then, these grantors were not persons who would be likely from force of habit, to attach seals, they must have attached the scrolls in this case for a purpose, and there could have been no purpose other than to make them seals. This instrument in its form purported to convey land, and was intended to convey land; and the statute at that time, but recently enacted, required a conveyance of land to be made under seal. It was therefore not a matter of indifference whether the instrument was sealed or not. We must presume, then, that the parties intending to convey land, and knowing the change in the law, undertook to conform to the statute, and to execute such an instrument as would be effectual for the purpose intended. They did not insert in the witnessing clause the fact that they had sealed the instrument, but the law did not require that to be done, and they were not accustomed to this formula.

The acknowledgment of the husband was made to this deed, in due form, on the twenty-ninth of September, 1855, before the county clerk, thus conforming to the requisites of the statute in all particulars. The wife does not appear to have been present at that time, as her acknowledgment was made before the same officer on the fifteenth of October following, and the instrument was recorded on that day. The provisions of the law having been complied with in all these respects, I think that all these things go to prove that the scrolls were intended to be seals, although no reference to them appears in the witnessing clause of the instrument. These scrolls certainly could not have been appended to a deed in Spanish by these parties by accident or from the force of habit.

The only question remaining is as to whether or not the scrolls were affixed at the time of execution. The argument is that they should not be held to be seals, because they might have been subsequently attached. But we are not to presume that a forgery has been committed, and it would be a forgery by means of the addition of a seal to convert a simple contract into a deed. This is not an instrument which might indifferently be executed with or without a seal. The party who took the acknowledgments—the county clerk—was one of the witnesses to the deed, and he would be likely to know whether or not it was sealed. As he took the acknowledgments of both grantors, and witnessed it, it is probable that he retained the document in his hands from the twenty-ninth of September, the day of its date and the time when it was acknowledged by the husband, until the fifteenth of October, on which day it was acknowledged by the wife and recorded; and as the scrolls were upon it when it was recorded it is hardly probable that they were not there at the time of the acknowledgment. A forgery could hardly be committed upon the record as well as upon the deed. The date of the record and of the acknowledgment of the wife are the same, so there was no interval between the witnessing, acknowledgment and record, all of which were done by the same party—the county clerk.

I am therefore disposed to think, and I so hold, that the scrolls upon this instrument were by the grantors adopted as and intended for seals, and were affixed at the time of the execution, and being so, they are in fact seals, within the meaning of the statute, and the instrument is a deed. But if it were not a deed, then, under the law, it would be a valid contract to convey, because there is a consideration expressed in the instrument. If that is the case there is an interest vested in the grantee, which has come by a series of conveyances to the defendant, and a conveyance could be inforced in equity; but if it were not a contract to convey upon a consideration, but only a vol-

untary contract, it would at least still stand on an equal footing with the instrument to Tico. In either of these aspects the instrument to Tico would not be inforced in equity as an equitable contract to convey even against Olivera himself. It is well settled that a voluntary executory contract—a contract without either a valuable or a meritorious consideration—cannot be inforced, except in some instances, in favor of a wife or child, even against the grantor, and never against subsequent purchasers, for a valuable consideration, or even against subsequent voluntary grantees. In his Equity Jurisprudence, section 706a, Story says:

"In respect to voluntary contracts inter vivos, it is a general principle that courts of equity will not interfere, but will leave the parties where the law finds them. In respect also to gifts and assignments inter vivos, courts of equity will inforce them only when the gift or assignment is perfect and complete, so that nothing further remains to consummate the title of the donee. For, if the gift or assignment is imperfect, or any further act remains to be done to complete the title of the donee, courts of equity, treating the donee as a mere volunteer, will not aid him to carry it into effect, either against the donor or against his legal representatives." Again, section 787: "In conclusion, it may, however, be proper to remark that all the cases for a specific performance which we have been examining presuppose the contract to be between competent parties, and founded upon a valuable or meritorious consideration; for courts of equity will not, as we have seen, and shall presently more fully see, carry into specific execution any merely nude pacts or voluntary agreements not founded upon some valuable or meritorious consideration." And in section 793b: "We have alluded to the distinction between contracts founded upon a valuable consideration and such as are voluntary. Thus, if a party should enter into a voluntary agreement to transfer stock to another, or to give him a sum of money, or to convey to him certain real estate, courts of equity would not assist in inforcing the agreement either against the party entering into the agreement or against his personal representatives, for the party contracted with is a mere volunteer. The same rule is applied to imperfect gifts, not testamentary, inter vivos, to imperfect voluntary assignments of debts and other property, to voluntary executory trusts and to voluntary defective conveyances. Thus, where a parent has assigned certain scrip to his daughter by a written assignment, which operated as an equitable assignment only, and not as a legal transfer, a court of equity refused to compel the donor or his executors to perfect the gift. So, where a lady by a writing assigned a bond of a third person to her niece and delivered the bond to the latter, and then died, a court of equity refused to

inforce the assignment against the executor or to decree payment of the money by the obligor to the niece. * * * So, where a husband executed a document which was attested by two witnesses, giving to his wife a freehold house in which they resided, but afterwards died without making a will, and the heir at law recovered a verdict for the possession of the house against his wife, it was held, that the gift to her was incomplete, and a bill asking that the heir at law might be declared a trustee to the wife was dismissed." Ellison v. Ellison, 1 White & T. Lead. Cas. Eq. marg. pp. 291, 292, is a leading case on the subject. Lord Chancellor Eldon, in deciding this case, said: "I take the distinction to be, that, if you want the assistance of the court to constitute you cestui que trust, and the instrument is voluntary, you shall not have the assistance for the purpose of constituting you cestui que trust; as upon a convenant to transfer stock, etc.; if it rests in convenant, and is purely voluntary, this court will not execute that voluntary convenant. But if the party has completely transferred stock, etc., though it is voluntary, yet the legal conveyance being effectually made, the equitable interest will be inforced by this court. That distinction was clearly taken in Colman v. Sarrel [1 Ves. Jr. 50], independent of the vicious consideration. I stated the objection that the deed was voluntary, and the lord chancellor went with me so far as to consider it a good objection to executing what remained in convenant." The point is illustrated by an elaborate note of many pages, cited from the English authorities, followed by an equally elaborate note citing the American authorities. The American editor, on page 288, says: "The principle is well established in this country, that an executory agreement, or imperfect conveyance, upon a merely voluntary consideration, will not be inforced or aided in equity (Caldwell v. Williams, 1 Bailey, Eq. 175, 176; Crompton v. Vasser, 19 Ala. 259; Hayes v. Kershow, 1 Sandf. Ch. 258; Reed v. Vannorsdale, 2 Leigh, 569; Evans v. Battle, 19 Ala. 398; Pinckard v. Pinckard, 23 Ala. 649; Holland v. Hensley, 4 Clarke [Iowa] 222), and hence a gift of real or personal estate will be void, unless so far executed as to pass the legal title, or attended with some peculiar circumstances which give rise to a special equity (Pringle v. Pringle, 9 P. F. Smith [59 Pa. St.] 281). 'It is clear general rule,' said Chancellor Kent, in Minturn v. Seymour, 4 Johns. Ch. 498–500, 'that a bill does not lie to inforce a mere voluntary agreement. The language of the books from the earliest to the latest cases, is uniform in support of the doctrine, that a voluntary defective conveyance, which cannot operate at law, is not helped in equity in favor of a volunteer, where there is no consideration nor any accident or fraud in the case. To entitle the party to the aid of

this court, the instrument must be supported by a valuable consideration, or, at least, by what a court of equity considers a meritorious consideration, as payment of debts, or making a provision for a wife or child.' To the same effect is Acker v. Phoenix, 4 Paige, 305–308. 'Voluntary executory agreements,' said Henderson, J., in Dawson v. Dawson, 1 Dev. Eq. 93–99, 'receive no aid, either from the courts of law or of equity. The parties stand upon their rights, such as they are, and hence it is a maxim, that defective voluntary agreements will not be aided in equity, any reformation of a conveyance being an execution of the original agreement, so far as the conveyance is varied. The same motive which induces a court to refrain from inforcing an agreement, no part of which is executed, prevents it from inforcing any part of it. The want of a consideration is, therefore, universally a good defense to a bill for rectifying a voluntary conveyance, or inforcing a voluntary agreement.' See, also, Banks v. May, 3 A. K. Marsh. 435, 436; Bibb v. Smith, 1 Dana, 580–582; Darlington v. McCoole, 1 Leigh, 36–42; Tiernan v. Poor, 1 Gill & J. 217–228; Forward v. Armstead, 12 Ala. 124–127; Shaw v. Burney, 1 Ired. Eq. 148–150; Pinkard v. Pinkard, 14 Tex. 356; Bozelius v. Dyer, note to Lester v. Foxcroft [1 White & T. Lead. Cas. Eq. 768]."

Taking the case in its strongest and most favorable aspect for the complainant, under the rule established by the authorities cited, this instrument to Tico, whatever it is, still rests in agreement. It is but an unexecuted promise to convey without consideration. If we regard the conveyance to Jose Olivera y Romero as a deed, then there is a valid conveyance, there being a consideration expressed—or even if no consideration were expressed, one would be implied from the seal; and the legal title passed by it to Romero, and from him, through subsequent conveyances, to the defendant.

To get that title out of defendant, the complainant here should, of course, if he has any equitable title as against the legal title in defendant, file a bill for a specific performance, or to charge defendant as his trustee. If the defendant here, who claims under Romero, has only a contract to convey, still it is a valid contract, because a good consideration is expressed, and he could compel a conveyance from Olivera. Even if we go beyond that, and say, that he has merely a voluntary contract, he is still, under the authorities that I have cited, as compared with the complainant, in the better position, and equity will not interfere to aid complainant.

In regard to this case, I will add, that I do not see that there are any equities in favor of the complainant. It does not appear that Olivera himself ever after its date treated this so-called conveyance to Tico as of any consequence, because, when he subsequently

conveys to Burton two thirds of the rancho, embracing the undivided half claimed to be in Tico, he makes no mention of any prior conveyance; but on the contrary, says he has not incumbered it in any way, and in all his subsequent conveyances to other parties, he invariably alludes to the conveyance which he had made to Burton, in which very conveyance, which is a deed of bargain and sale, he declares that he has not created any lien or incumbrance upon the land. In his deed to Jose Olivera y Romero, he conveyed that portion of the rancho which he had not theretofore conveyed to Burton, thus recognizing the conveyance to Burton, but making no reference whatever to this instrument to Tico, and more than that, he says, in the conveyance to Romero, that he has never sold, or conveyed, or incumbered, or put any lien upon the premises conveyed thereby, which is inconsistent with his recognition of any right in Tico; and the complainant, Burton, was a witness to this deed. It appears, then, that neither Olivera nor any one else ever treated Tico as having any interest in the land, and there is nothing in this case to show that Tico ever claimed any right to or interest in it, under the instrument to him. The only time that Tico ever appears in connection with the land at all, is many years after, when, after the title had once been in Burton and had passed through him to defendant, he, Burton, procured from Tico a subsequent conveyance by quitclaim deed.

With the exception of making this last conveyance at complainant's solicitation for a nominal consideration, it does not appear that Tico has made any claim whatever to any interest in the land, although more than a quarter of a century has elapsed since the instrument relied on from Olivera was executed. It appears from the testimony in the case that some time in the fall of 1853, or early in 1854, a man, casually visiting the premises, found Olivera living on the land in one place, one of his sons living on it a short distance from him, and still farther up the canon he found Tico living upon the land; but there is nothing to show the character of his occupancy, and that is the only evidence presented which bears upon that point. This was a common mode of living among the old inhabitants, the sons building houses and living on the land of the father until they could get a grant for themselves. As has been stated, subsequent to the conveyance from Olivera to Burton, Olivera conveyed the remainder of the rancho to Jose Olivera y Romero, who conveyed to Antonia Arrelanes in 1858. On December 9, 1862, Arrelanes conveyed to complainant Burton all the Rancho Casmali not before conveyed to Burton by Olivera, that is to say, the premises in question. On February 13, 1863, complainant Burton quitclaimed the premises to Estudillo, whose title has been conveyed to defendant. There are other conveyances to defendant not necessary

to specify. The conveyances through which defendant claims were trust deeds, executed as a security for a loan of some fifty thousand dollars by the Hibernia Bank, for the payment of which Burton himself was a surety. Proceedings were had for foreclosure of the trust deed, and Burton took an active part in them, his object being to have such a sale made as would release him from personal liability; and the sale made under the trust deed passed to the purchasers at that sale, whatever title in the land he (Burton) and Jose Olivera y Romero had received subsequent to the instrument executed to Tico, and that title has since passed to the defendants in this case. Burton's counsel was present at the sale of the premises, and the property was bid off and passed to the purchasers, according to the arrangement which had been agreed upon, in order that he (Burton) might be relieved from his responsibility.

In 1863, after these transactions had occurred, Burton procured from Tico a quitclaim deed for the whole rancho, including the premises in question, being the deed upon which he now relies for title as against defendant. Packard, who was superintending the business affairs of Burton, the latter being an invalid, testified that the quitclaim from Tico was procured through his advice and by his arrangement. The consideration expressed in the deed is only two hundred dollars. The sum of two hundred dollars was no consideration for a half interest in a rancho containing two leagues, after the grant had been confirmed and a patent issued. Manifestly, in taking that quitclaim he had no other intention than to clear a cloud from his own title to his share—some two thirds of the rancho. He was a witness to the deed from Olivera to Romero, and knew all the circumstances of the case. Up to that time it does not appear that Tico had set up any claim to the premises. There is nothing in the evidence to show that he ever made any claim to or had any interest in the land except the fact that he received that instrument from Olivera, whatever it is. The use now sought to be made by Burton of the quitclaim upon a nominal consideration is evidently an afterthought, and would be grossly inequitable as against his prior grantees and the defendant holding under them. The intrinsic substantial equities, as well as the legal rights, therefore, are not in favor of the complainant, but with the defendant.

Again, Burton, in his bill, alleges that he is seised in fee of these premises, and that he is in possession. He alleges title in fee and possession as his grounds of action. If he has only an equitable claim here, the legal title being in the defendant, the grounds upon which this bill is based are not such as would entitle him to equitable relief. He must obtain his relief according to the allegations of his bill. He has set up title in

himself, but as we have seen, it is not in him but in defendant. If he has anything at all it is this agreement to convey. The title is in the other party. If he has any right at all it is to charge the other party as a trustee for his benefit, and to require a specific performance. The bill is not framed in that aspect, or for that purpose. If the other party is a trustee, and the complainant wishes to divest him of that title the bill must be framed in that aspect, and the issues would be entirely different from those raised by the bill in this case, and the defense might be different. In an action of this kind it is not necessary to set out in the bill the character of the defendant's adverse claim, for the complainant may not know it. He may call upon the defendant to state what his claim is, but the complainant must be presumed to know the character of his own title, and he must state it correctly, if he states it at all. At all events, as in other cases, he will be limited in his relief to the case made by the bill. He cannot obtain affirmative relief upon the defendant's answer alone. If it be sufficient, as held in the California cases, though denied by the supreme court of the United States in a case arising under a similar statute in Oregon, to simply allege possession, it is because possession is prima facie evidence of title in the possessor. But upon a bill alleging possession alone as the grounds of action, if it should turn out that the prima facie case of title made by possession should be overthrown by evidence introduced showing title to be in the defendant, I apprehend that relief could not be given complainant on some other grounds not stated in the bill. The defendant is only bound to meet the case presented by complainant's bill. In this case, if complainant neither had title nor possession, or if being in possession the prima facie case of title made by possession is overthrown by title shown in defendant, all grounds for relief alleged fail.

The complainant alleges both title in fee and possession. We have seen that he has not title, but that title is in defendant, and that rebuts the presumption arising from possession, if possessed he was. But I am not satisfied that he was in possession. The only evidence to that effect is the testimony of Packard, and that is extremely loose. His testimony is simply in effect, that Burton has not for years past been in a condition of health or of mind to attend to his business, and that he, Packard, has had charge of Burton's affairs; that he is the man who knows the facts bearing upon this subject; that in 1871 (Burton got his quitclaim in 1863) he leased—what? Not the specific land now in question, but "all his rights in the rancho of Casmali," first to Arques, who held to 1873, then transferred his lease to Castanos, who occupied until 1875, when Burton leased to Conway; and that they took possession under their lease.

and paid rent. That testimony is extremely indefinite, because Burton undoubtedly owned about two thirds of the Casmali rancho, being all the part lying westerly of a designated line, but not including any part of the premises in question upon which portion so owned by him, the leases could operate. The dividing line between the two tracts divides them into what are now called the Casmali and the Ospe. That line is certain. Conway himself testifies, that he did not lease from Burton that part of the ranch which is conveyed to the defendant, but that he leased that from Steinback and Le Roy; and he further testifies, that the line was surveyed under his direction, and that Arques himself, while he was in possession under Burton, pointed out that line as the line between the land of the two parties in interest. Arques, he says, did not pretend to be in possession of all the rancho under Burton, and he says the same in reference to Castanos. He says that he himself never claimed to be in possession under Burton of that part of the rancho now called Casmali, but only of that part called Ospe. The other part he claimed to hold under Steinback, Le Roy's agent, and paid rent to them for it. He also testified, that McPhaul held possession of that portion of the rancho under Steinback and Le Roy. He testifies, that Sexby was corralling cattle for McPhaul on the part now called Casmali, and whenever his, Conway's, cattle, or any others went from Ospe over on to that part claimed by the defendant they were always corralled, and he was compelled to pay money in order to get them out. Arques was the first one of the men who, as Packard states, took a lease from and attorned to Burton; but Conway testifies that he, Arques, never claimed the part in question under Burton, but on the contrary, claimed under and paid rent to the other party. Sexby also states the same thing, that these parties claiming under Burton claimed up to that line and no farther. These witnesses, while in possession state these facts, showing the title under which they held. Then, there is evidence that prior tenants paid rent to Nugent for the Estudillos, defendant's grantors. I think, then, that the testimony shows that Burton was not in possession of this land, but that the possession was in the other parties—the defendant and his grantors—so that Burton's claims to title and possession both fail, unless the testimony is grossly at fault. The testimony of Packard is very loose, while that of the other witnesses named is specific. Packard nowhere testifies in specific terms, that he, as Burton's agent, leased this specific portion of the land, while, on the other hand, the parties to whom he leased testify and state that they did not hold possession of the land in question under Burton. His statement of a lease to all Burton's interest in the Casmali rancho, is not necessarily inconsistent

with the testimony of the other witnesses, that they held the premises in question from defendant and his grantors, for Burton really had no interest in this part of the rancho. In my judgment, the testimony shows that possession was in defendant, and not in Burton. There is, to my mind, not one unequivocal act of possession in Burton satisfactorily shown by the testimony. The defendant held and possessed under deeds of bargain and sale, purporting to convey the whole, and declaring in express terms, that there had been no previous sale or conveyance, lien or incumbrance, and this possession must have been adverse. I think, then, that the complainant is not entitled to the relief demanded or to any relief: 1. Because he has failed to prove the case which he alleges in his bill. 2. Because it appears that he is, at best, a mere volunteer promisee, claiming against parties who have acquired title for a valuable consideration, and, therefore, a court of equity will not interfere to inforce his claim. 3. Because the equities, as well as the legal title and rights, are with the defendant, and not with the complainant.

It follows, therefore, that the complainant's bill must be dismissed, and it is so ordered.

[NOTE. An impression on paper sufficiently clear to be recognized will constitute a valid seal. Pillow v. Roberts, 13 How. (54 U. S.) 472, affirming Pillow v. Roberts, Case No. 11,167; Follett v. Rose, Id. 4,900; Pierce v. Indseth, 106 U. S. 546, 1 Sup. Ct. 418. The interposition of wax is unnecessary. Id. An ink mark, if so intended, will be sufficient. U. S. v. Coffin, Case No. 14,823. The existence of a seal may be presumed from a statement in the instrument that the grantor affixed his seal, etc. Le Franc v. Richmond, Id. 8,209. A deed is not invalidated by the seal being torn off by the grantor or with his consent. Cutts v. U. S., Id. 3,522.]